UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                    :
GAIL GODWIN,                    :
                                      :
                     Plaintiff,     :        04 Civ. 2852 (DLC)
                                        :
        -v-                     :        <u>OPINION AND ORDER</u>
                                        :
JO ANNE BARNHART, Commissioner of    :
Social Security,                :
                                      :
                    Defendant.    :
                                      :
--------------------------------------X

Appearances:

For <u>Pro Se</u> Plaintiff:

Gail Godwin
70 West Third Street
Apartment 6B
Mount Vernon, New York  10550

For Defendant:

David N. Kelley
United States Attorney
Lorraine Novinski
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007

DENISE COTE, District Judge:

On April 14, 2004, Gail Godwin ("Godwin") filed this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain review of the final decision of the Commissioner of Social Security ("Commissioner") declaring her no longer disabled as of April 1, 2000.  The Commissioner has moved for a judgment on the pleadings.  This motion principally addresses Godwin's claims that the Administrative Law Judge ("ALJ") did not assign

appropriate weight to the opinions of her treating physicians, and that she was denied her right to cross-examine the Social Security Administration's ("SSA") consulting physicians and present rebuttal evidence.  For the following reasons, the Commissioner's motion is granted.

## BACKGROUND

The following facts are taken from the administrative record.

1.  Godwin's Initial Disability

    A.  Medical History

On January 6, 1994, Godwin injured her back when she slipped and fell on some ice.  After her fall, she experienced lower back pain radiating into her left leg and numbness in her left leg and foot.  Magnetic Resonance Imagings ("MRIs") of Godwin's lumbar and cervical spine on August 8, 1994 revealed a herniated disc and straightening of the normal lordotic curve.

On March 9, 1995, Godwin saw Dr. Mario Nelson ("Dr. Nelson"), a consulting physician, for a physical therapy consultation.  Dr. Nelson noted a loss of motion in Godwin's cervical and lumbar spine, some paravertebral spasm in her cervical and lumbar muscles, a positive straight leg raising at 50 degrees on her left side, and a decreased pinprick sensation in her left foot.  Dr. Nelson reported that the electrodiagnostic studies performed on Godwin were compatible with an L5/S1 radiculopathy.  Repeat electrodiagnostic studies on March 22,

1995 showed borderline L4/5 radiculopathy.

At an April 23, 1996 evaluation, Dr. Richard J. Radna ("Dr. Radna"), a neurosurgeon, noted some moderate loss of motion in Godwin's cervical and lumbar spine, a moderate amount of spasm in her cervical and lumbar muscles, and positive straight leg raising on both sides. Dr. Radna completed a Residual Functional Capacity Assessment for the SSA indicating that Godwin could sit and stand and/or walk for a maximum of fifteen minutes each in an eight-hour work day, lift or carry a maximum of five pounds occasionally, and never bend, squat, crawl, or climb. Dr. Radna described Godwin as "totally disabled" due to cervical and lumbo-sacral radicular pain syndrome and recommended that she have back surgery.

B.  Administrative and Hearing History

Godwin stopped working as a welfare eligibility specialist for the City of New York on November 25, 1994, later citing various reasons for her departure, including layoffs at work as well as back pain. On March 23, 1995, Godwin filed applications for disability insurance benefits and supplemental security income based on an alleged inability to perform any substantial gainful activity since November 25, 1994 due to her back injury. The SSA denied these applications both initially and upon reconsideration, after which Godwin timely filed a Request for Hearing before an ALJ.

Following an April 30, 1996 hearing, the ALJ determined that from November 25, 1994 through March 8, 1995, Godwin retained the

capacity to perform sedentary work, which included her past work as a welfare eligibility specialist.  The ALJ found that beginning with Godwin's first visit to Dr. Nelson on March 9, Godwin's physical abilities were limited to such an extent as to be incompatible with a full range of sedentary work.  Such limited work capacity eroded Godwin's occupational base, making it incompatible with work that exists in significant numbers in the national economy.  Accordingly, the ALJ concluded that Godwin had been under a "disability," as defined in § 423(d) of the Social Security Act, 42 U.S.C. § 423(d) ("Section 423(d)"), since March 9, 1995, but not prior thereto.  The ALJ also concluded that due to Godwin's youth and intelligence, and the possibility of her recovery, the SSA should review her claim annually.

2.  Godwin's Condition After Surgery in June 1999

    A.  Medical History

    On June 1, 1999, Dr. John A. Galeno ("Dr. Galeno"), one of Godwin's treating physicians, performed surgery on her for a herniated disc and osteophytes in her cervical spine.  She spent one week in the hospital recovering and was discharged on June 8.  On June 17, Godwin complained to Dr. Galeno about pain in her neck, shoulders, lower back and left leg.  She was restarted on Vicodin and was given a hard collar.  On July 13, Godwin's chief complaint to Dr. Galeno was of a pain in her left leg, however, she also reported a pain in her neck.  On August 23, she complained to Dr. Galeno of a slight weakness in her arms and pain in her lower back.  Despite Godwin's complaints, Dr. Galeno

indicated in his notes that Godwin was doing well and that she should continue to use the hard collar.  On October 25, Dr. Galeno reported again that Godwin was doing well, although she had occasional pain and difficulty swallowing.  He noted that her wound from the surgery was well-healed, she had no tenderness, and her range of motion was good.  On January 14, 2000, Godwin reported some numbness and intermittent pain to Dr. Galeno.  Dr. Galeno noted that Godwin was neurologically intact and that she had no tenderness.

On February 28, 2000, Godwin underwent an orthopedic examination by a consulting physician with the Office of Disability Determination, Dr. Ronald Bagner ("Dr. Bagner").  Godwin reported to Dr. Bagner that her cervical spine was improving, but that she continued to have pain in her lower back and numbness down the entire left side of her body, for which she took Vicodin and Motrin.  Godwin reported that she was unable to walk a block, stand for half an hour, climb a flight of stairs, sit in a chair for half an hour, or carry a small bag of groceries or a gallon of milk.  Godwin reported that she was able to do her own cooking, cleaning and shopping, but that she could not do any laundry.  Dr. Bagner noted that Godwin had no difficulty ambulating, getting on and off the examination table, changing clothes for the examination, or sitting comfortably during the examination.  Dr. Bagner also noted that Godwin's gait and station were normal and that she did not use a cane or any other assistive mobility device.

Dr. Bagner reported that Godwin had a normal range of motion in her cervical spine with some pain on movement, normal sensation and a normal range of motion throughout her arms, and that her grip strength was slightly reduced on the left (4/5) and was full on the right (5/5). Dr. Bagner tested Godwin's dexterity and determined that she was able to handle both large and small objects, write, tie a bow, button a button, open a cap, and zip a zipper. Dr. Bagner determined that Godwin's range of motion in her spine was normal, with complaints of pain on movement of her lower back. Dr. Bagner noted that Godwin's raising her leg straight did not produce any pain, her reflexes were full, there was no atrophy of her gluteal, thigh or calf muscles, and she had no sensory abnormality in her legs. According to Dr. Bagner, Godwin had a normal range of motion throughout her legs with no tenderness and no effusion. Dr. Bagner reported that Godwin's prognosis was fair.

On March 20, 2000, Godwin again saw Dr. Galeno and told him that she was experiencing constant pain and a loss of coordination in her left arm. Dr. Galeno's notes indicate that Godwin's neck pain was intermittent and she was losing strength in her left arm.

On March 30, 2000, Dr. Finley, a consulting physician with the SSA, assessed Godwin's functioning in a Physical Residual Functional Capacity Assessment report after a review of Godwin's medical records. According to Dr. Finley, Godwin was able to lift ten pounds occasionally, stand or walk for at least two

hours in an eight-hour work day with normal breaks, sit for about six hours in an eight-hour work day with normal breaks, and had an unlimited capacity to push and pull. He also noted that she had no postural limitations such as climbing stairs, kneeling or crouching.

On August 16, 2000, Dr. John Jacoby ("Dr. Jacoby"), one of Godwin's treating physicians who had been treating her periodically since 1998, examined her and completed a Disability Determination questionnaire on her condition.[1] His treating diagnosis of Godwin was that she had "left hemiplegia anxiety." Hemiplegia is the paralysis of one side of the body. Dr. Jacoby indicated that his clinical findings were minimal, but that Godwin nevertheless was unable to work because she could not use her left hand. In Dr. Jacoby's opinion, Godwin could lift and carry a maximum of eight pounds with her right hand only, stand or walk for up to two hours a day, and sit without limitation. Dr. Jacoby also noted that she was limited in pushing and pulling due to fatigue and inability to use her left arm.

On September 25, 2000, Godwin was examined by another SSA consulting physician, Dr. William Lathan ("Dr. Lathan"). Godwin reported to Dr. Lathan that she had a pain in her mid-lumbar back, a number of intermittent problems with the left side of her body including weakness in her left arm, a diminished grip in her left hand and swelling of her left leg, as well as intermittent

---

[1] In his July 23, 2003 decision described more fully below, the ALJ mistakenly attributes this report to Godwin's surgeon and other treating physician, Dr. Galeno.

numbness and pain in both hands and forearms.  Godwin stated to
Dr. Lathan that she had been diagnosed with carpal tunnel
syndrome and that she occasionally wore a wrist brace for this
condition.  Godwin denied any psychiatric history but admitted
feeling depressed about the illness of her daughter.  At this
time, her medications consisted of Tylenol with codeine, Vicodin,
Motrin, and Relafen, each of which was taken as needed.  Godwin
reported that she was able to wash and dress herself, cook, shop,
clean house, and do laundry, but she was not able to lift heavy
objects.  Dr. Lathan noted that Godwin wore a lumbo-sacral corset
when coming in for her examination, and that her gait and stance
were normal, that she used no assistive devices in ambulating,
such as a cane, and that she needed no assistance getting on and
off the examination table, changing clothes for the exam or
rising from her chair.

Upon examination, Dr. Lathan noted that Godwin had full
range of motion throughout her arms with full strength (5/5) in
both hands.  Examination of Godwin's cervical and thoracic spine
was normal, although flexion of her lumbar spine was limited to
forty-five degrees in the forward direction.  Dr. Lathan also
noted that Godwin had no spasm or point tenderness in her lumbar
spine and her range of motion and muscle strength were full
throughout her legs.  Dr. Lathan noted that Godwin had no
redness, swelling, heat, or effusion in any of her joints; her
reflexes were normal; she exhibited no sensory deficit; and she
exhibited no evidence of muscle atrophy in her arms, hands, or

legs.  Dr. Lathan determined that Godwin's hand and finger
dexterity were intact and her grip strength was full (5/5)
bilaterally.  In Dr. Lathan's opinion, Godwin was impaired with
respect to bending forward and for handling more than twenty
pounds.  Because Godwin complained of depression, Dr. Lathan
arranged for an SSA psychiatric consultation for the same day.

Dr. Shari Bronsky ("Dr. Bronksy"), a consulting
psychiatrist, performed a psychiatric evaluation of Godwin on
September 25, 2000.  Unlike her report to Dr. Lathan, Godwin
reported to Dr. Bronsky that she was able to dress, bathe, groom,
and cook without assistance, but could not clean, do laundry or
shop because of chronic pain.  In Dr. Bronsky's opinion, Godwin
was able to understand and carry out simple instructions, perform
simple, rote tasks with supervision, maintain adequate attention
and concentration for such tasks, make appropriate decisions, and
learn new tasks.  Dr. Bronsky added, however, that Godwin might
have some difficulty with complex tasks, relating adequately with
others, and dealing with stress.

On October 10, 2000, a medical consultant with the SSA
assessed Godwin's functioning in a Physical Residual Functional
Capacity Assessment report after a review of Godwin's medical
records.  The medical consultant opined that based on the various
medical opinions in her record, Godwin was able to lift twenty-
five pounds frequently and fifty pounds occasionally; she could
stand or walk, with normal breaks, for about six hours in an
eight-hour work day; and she could sit for about six hours, with

9

normal breaks, in an eight-hour work day.

On November 9, 1999, five months after Godwin's back surgery, the SSA sent Godwin notice that they were conducting a continuing disability review of her case. In her Report of Continuing Disability Interview dated November 24, 1999, Godwin stated that she suffered from great and constant pain while walking, sitting, and moving about. She stated that her current condition remained the same, that she had acute numbness on the left side of her body, pain and numbness from her left hip to her left foot, and had some difficulty swallowing because her throat had not completely healed from the surgery. She also stated that she was unable to sit for long periods of time, that she had chronic and extreme pain in her back, that both her hands were very painful, and that she had constant swelling and extreme burning which traveled from her hands to her shoulders.

On January 9, 2000, in a Division of Disability Determination questionnaire, Godwin reported that she was living by herself and was able to do her own cooking and shopping. She stated that she was able to do light household chores but sometimes needed assistance with heavy cleaning. Godwin reported that she had constant pain in her lower back, throat, spine and left hip, and that the pain radiated throughout the left side of her body. She reported that she experienced the pain "everyday, 24 hours per day," but also reported that the pain was brought on by sitting and bending. According to Godwin, her medication,

Vicodin, provided sporadic relief and had no side effects. She wore a back brace to relieve her pain. According to Godwin, her daily activities included walking in order to strengthen her hip and leg and doing household chores. She reported that her pain sometimes affected her activities and that when it rained the pain was unbearable.

On April 7, 2000, Godwin received a letter from the SSA notifying her that, based on the medical improvement in her impairment and on her increased ability to engage in significant gainful activity, she was no longer considered disabled as of March 30, 2000, and that her benefits were to cease in June 2000. On April 18, Godwin submitted a Reconsideration Report in which she stated that she was unable to cook, clean, or wash independently, hold anything in her left hand when the weather was bad, sit or stand "for any period of time," reach over her head, button her clothes, bend down or bathe herself, and that she had difficulty walking. She stated that her daughters came to her house every day to help her.

Godwin received two "Notice of Hearing" documents from the ALJ, one dated December 15, 2001, and the other dated, February 1, 2002, informing her of her upcoming hearing. Among other things, both of these Notices state:

> If there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see your file before the date of the hearing, call this office.
> . . . .
> If you want me to issue a subpoena, you must submit a written request. You should submit the request as soon

as possible before the hearing.  The request must
identify the needed documents or witnesses and their
location, state the important facts the document or
witness is expected to prove, and indicate why you
cannot prove these facts without a subpoena.

The Notices also state that Godwin could be represented by

counsel at the hearing, and that if she wished to obtain a

representative, she should "get one right away."

On February 28, 2002, a hearing was held in White Plains,

New York, before ALJ Herbert Rosenstein.  Godwin appeared,

without representation, and testified at the hearing.  Godwin

also brought copies of medical documents that she asserted

supported her claim of ongoing disability.  At the hearing, the

ALJ asked Godwin about her <u>pro se</u> status and whether she would

like to have representation:

ALJ: . . . In notices we sent to you, we advised you of
your right to be represented by an attorney or other
representative of your choosing.  I note that you're
appearing here today by yourself.

CLMT: Yes.

ALJ: If you feel that you would like to be represented
by an attorney or other representative and you need
more time to obtain a representative, I can postpone
the hearing to give you more time.  If you feel you
would prefer to proceed today by yourself, we could do
that too.  The choice is yours.

. . . .

CLMT: Right.  Well, I just thought that I would try to
represent my own self --

ALJ: All right.

CLMT: -- today.

ALJ: You want to proceed today?

CLMT: Yes.

ALJ: Okay.  All right. . . .

The ALJ also asked Godwin about her awareness of the written
record that the ALJ would rely upon in making his decision as
follows:

> ALJ: . . . Now, you've had a chance to look through the
> papers which are pertinent to your case, is that --
>
> CLMT: Yes.
>
> ALJ: -- right?  All right, now, I will mark these
> papers in evidence and that means that this will be the
> written record that I will consider unless you have any
> objection to that?
>
> CLMT: No, I don't.

Among other things, the ALJ inquired about Godwin's mental state,
the nature of her pain, including its frequency, intensity, and
location, as well as the circumstances that trigger it, physical
movements she can perform, activities in which she participates,
and details about her visits to various doctors.  Godwin informed
the ALJ that her daughter had passed away recently and that she
was now living with and caring for her three grandchildren.
Godwin testified that she was able to sit for about half an hour
before needing to get up and walk to relieve the pain.  When the
ALJ asked Godwin why she believed she was unable to perform a
sedentary level job, Godwin indicated that she had carpal tunnel
syndrome in both hands, that the muscles in her left hand were
"completely gone" and that she had five pinched nerves on the
left side of her neck.  She testified that she had problems
holding objects in her hands but she was able to write because
she was right-handed.  Godwin provided the ALJ with medical

documents, although none of those documents contained a medical diagnosis of carpal tunnel syndrome, muscle atrophy, or pinched nerves.

After the hearing, and apparently on his own initiative, the ALJ also attempted to gather additional information from Dr. Jacoby.  On March 5, 2002, the ALJ sent a request for an assessment by Dr. Jacoby with the following instruction: "Fill out the enclosed assessment and show objective findings to support disability."  The request included a form entitled "Medical Source Statement of Ability To Do Work-Related Activities (Physical)."  On April 2, the ALJ sent a second such request to Dr. Jacoby.  On May 7, the ALJ subpoenaed Dr. Jacoby to produce the medical assessment on or before June 5.  There is no indication in the record that Dr. Jacoby complied with either of the two requests or the subpoena.

On July 23, 2004, the ALJ issued a decision finding that Godwin's claimed impairment did not "meet or equal" the severity of the impairments listed in Appendix 1 of the Regulations ("Appendix 1") and that the medical evidence established that there had been work-related improvement in Godwin's condition since March 9, 1995, the date she was originally found to be disabled.  The ALJ determined that Godwin retained the "residual functional capacity" to perform sedentary work, that her past relevant work as a welfare eligibility specialist was sedentary in nature, that she could perform her past relevant work, and that, therefore, she was no longer under a "disability" as

defined in Section 423(d) as of April 1, 2000.  The Appeals
Council denied Godwin's request for review on January 27, 2004.

## DISCUSSION

_____In reviewing the decision of the Commissioner, a district
court may "enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security, with or without
remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A
court must uphold the Commissioner's decision unless it is not
supported by substantial evidence or is based on an erroneous
legal standard.  <u>Curry v. Apfel</u>, 209 F.3d 117, 122 (2d Cir.
2000).  Substantial evidence in this context means "more than a
scintilla.  It means relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  <u>Halloran v.
Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citation omitted).  It
is not the function of the reviewing court to determine <u>de novo</u>
whether a claimant was disabled.  <u>Curry</u>, 209 F.3d at 122.
Furthermore, "it is the function of the agency, and not this
court, to weigh the conflicting evidence in the record."  <u>Clark
v. Commissioner of Social Security</u>, 143 F.3d 115, 118 (2d Cir.
1998)(citation omitted).  It is well-settled that the ALJ is not
required to "reconcile explicitly every conflicting shred of
medical testimony."  <u>Fiorello v. Heckler</u>, 725 F.2d 174, 176 (2d
Cir. 1983) (citation omitted); <u>Mimms v. Heckler</u>, 750 F.2d 180,
186 (2d Cir. 1984) (the ALJ's credibility determination is

subject to deference).

A finding of disability will be made if the applicant can demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The inability to engage in substantial gainful activity, not merely the medical condition, must last for a continuous period of at least twelve months for the individual to be found disabled. <u>Barnhart v. Walton</u>, 535 U.S. 212, 222-23 (2002). The statute additionally requires that the applicant's impairment be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The disability must be a result of physical or psychological abnormalities that are "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Once disability benefits are granted to an individual, the Commissioner may terminate their disbursement if she finds that the impairment upon which the benefits were provided is no longer disabling. 42 U.S.C. § 423(f). When such a finding is based on

a change in the individual's condition,[2] the finding must be
supported by substantial evidence indicating both (1) that there
has been medical improvement in the individual's impairment and
(2) that, at the time of the determination, the individual is
able to engage in substantial gainful activity.  42 U.S.C. §
423(f)(1).  For this purpose, "medical improvement" means:

> any decrease in the medical severity of [the
> individual's] impairment(s) which was present at the
> time of the most recent favorable medical decision that
> [the individual was] disabled or continued to be
> disabled.  A determination that there has been a
> decrease in medical severity must be based on changes
> (improvement) in the symptoms, signs and/or laboratory
> findings associated with [the individual's]
> impairment(s).

20 C.F.R. § 404.1594(b)(1).  To determine whether medical
improvement has occurred, the Commissioner compares the medical
severity of the impairment present at the time of the most recent
favorable decision that the individual was disabled (the
"Comparison Point") with the current severity of the impairment.
20 C.F.R. §§ 404.1594(b)(7), (c)(1).  Where the evidence
demonstrates that medical improvement has occurred, the
Commissioner must then compare the individual's current
functional capacity to her capacity at the Comparison Point in
order to determine whether the medical improvement has resulted
in an increase in the individual's ability to perform basic work
activities.  20 C.F.R. § 404.1594(c)(3)(ii).  In the present

---

[2]  An individual's disability may be found to have ceased
even without improvement if, for example, medical advances or a
course of therapy makes it possible for the individual to perform
substantial gainful activity despite the absence of any change in
her underlying medical condition.  42 U.S.C. § 423(f)(2).

case, an ALJ last determined that Godwin was disabled on June 6, 1996.  Accordingly, that date is the Comparison Point.

To ensure that disability reviews are carried out in a uniform manner, that decisions of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally, and are fully documented, the SSA follows an eight step process in reviewing the question of whether a claimant continues to be disabled.  See 20 C.F.R. § 404.1594(f).  The review may cease and benefits may be continued at any point if the SSA determines that there is sufficient evidence to find that the claimant is still unable to engage in substantial gainful activity.  Id.  In proceedings to terminate benefits, the Commissioner "has the burden of showing that a claimant has the ability to engage in substantial gainful activity."  Glenn v. Shalala, 21 F.3d 983, 987 (10th Cir. 1994).

The first step of the continuing disability review is to determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 404.1594(f)(1).  If she is, the Commissioner will find disability to have ended.  If she is not, then the Commissioner continues the review.

The second step is to determine whether the claimant has an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1.  20 C.F.R. § 404.1594(f)(2).  If so, the claimant's disability will be found to continue.  Id.  If the claimant does not have an impairment

which meets the severity of those in Appendix 1, then the Commissioner continues to the next step.

Third, the Commissioner considers whether there has been "medical improvement" as defined above. 20 C.F.R. § 404.1594(f)(3). If there has been no decrease in medical severity, there has been no medical improvement. Id. If there has been medical improvement as shown by a decrease in medical severity, then the review continues.

Fourth, the Commissioner determines whether the medical improvement is related to the claimant's ability to do work in accordance with 20 C.F.R. §§ 404.1594(b)(1)-(4); i.e., whether or not there has been an increase in the residual functional capacity based on the impairment that was present at the Comparison Point. 20 C.F.R. § 404.1594(f)(4). If medical improvement is not related to the claimant's ability to do work, then, after determining in step five that certain exceptions do not apply, the claimant's disability will be found to continue.

If medical improvement is related to the claimant's ability to do work, then the sixth step is to determine whether all her current impairments in combination are severe.[3] 20 C.F.R. § 404.1594(f)(6). When the evidence shows that all the claimant's current impairments in combination do not significantly limit her physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature and the

---

[3] See 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

claimant will no longer be considered disabled.  Id.

If the impairment is severe, however, such that the residual
functional capacity assessment in step four shows significant
limitation of the claimant's ability to do basic work activities,
then the seventh step is to assess the claimant's residual
functional capacity based on all her current impairments and
consider whether she can still do work she has done in the past.
20 C.F.R. § 404.1594(f)(7).  If the claimant can do such past
work, then her disability will be found to have ended.  Id.

If the claimant is not able to do work she has done in the
past, the final step is to determine whether she is able to do
other work given the residual functional capacity assessment and
considering her age, education and past work experience.  20
C.F.R. § 404.1594(f)(8).  If she is able to do other work,
disability will be found to have ended.  Id.  If she cannot,
disability will be found to continue.  Id.

In his July 23, 2003 decision, the ALJ applied the
continuing disability review inquiry outlined in 20 C.F.R. §
404.1594 to Godwin's case in order to assess her continuing
disability claim.  First, the ALJ determined that Godwin had not
engaged in any substantial gainful activity during the period in
question from June 6, 1996 through July 23, 2003.

Second, the ALJ determined that Godwin's "cervical and
lumbro-sacral radicular pain syndrome" did not "meet or medically
equal" the severity of any impairment in Appendix 1.

Third, the ALJ inquired into whether Godwin had shown

"medical improvement" as evidenced by a decrease in medical severity. The ALJ weighed the differing opinions regarding Godwin's exertion abilities received from treating, consulting, and reviewing physicians, as well as from Godwin's own testimony, and assigned evidentiary weight accordingly. The ALJ correctly noted that the opinions of Godwin's treating and consulting physicians were entitled to greater weight than those of the reviewing physicians, who did not actually examine Godwin but only reviewed her file. The ALJ also factored in Godwin's subjective symptomatology and overall credibility, including the location, duration, frequency, and intensity of her symptoms, as well as her daily activities, her medication, and her functional limitations and restrictions. The ALJ determined that Godwin's testimony was not fully consistent with the medical evidence in the record. For example, although she testified that she had carpal tunnel syndrome in both hands and that she had consequently experienced no medical improvement since her March 1995 hearing when she was originally found to be disabled, the ALJ correctly concluded that those claims were unsupported by the record. In fact, the ALJ noted that the medical signs and findings suggested that the intensity, persistence, and functionally limiting effects of Godwin's symptoms had not precluded an ability to perform basic work-related activities since benefits were ceased in April 2000. The ALJ therefore concluded that because of these inconsistencies, Godwin's subjective complaints should not be given substantial weight.

The ALJ determined that based on the opinions of her treating and consulting physicians, there had been medical improvement in Godwin's condition as shown by a decrease in medical severity.

Fourth, the ALJ found that there had been an increase in Godwin's residual functional capacity based on the impairment that was present at the time of her most recent favorable medical determination. Considering all of Godwin's current impairments and the impact of the combination of those impairments on her ability to function, the ALJ determined that the medical evidence demonstrated that the intensity, persistence, and functionality limiting effects of her symptoms had not significantly limited her physical or mental abilities to do basic work activities since April 2000, the date the SSA initially determined that she was no longer disabled. Based on consideration of the entire record, and emphasizing Dr. Jacoby's opinion in the medical questionnaire, the ALJ found that Godwin could sit up to and including six hours in an eight-hour workday, with normal breaks, stand and walk up to two hours in an eight-hour workday and lift and carry objects weighing up to and including ten pounds. Thus, the ALJ found that the medical evidence established that Godwin had the "residual functional capacity" to perform the full range of "sedentary exertion level work."[4]

Since the residual functional capacity assessment indicated

---

[4] See 20 C.F.R. § 404.1567(a) (defining sedentary work as requiring occasional standing and walking, as well as occasional lifting of such objects as ledgers or small tools but never more than ten pounds).

some limitation of Godwin's ability to do basic work activities,
i.e., she was limited to performing only sedentary level work,
the ALJ assessed Godwin's residual functional capacity based on
all of her current impairments to consider whether she could
still perform work she had done in the past.  20 C.F.R. §
404.1594(f)(7).  The ALJ found that Godwin's past relevant work
as a welfare eligibility specialist required her to sit for about
six to seven hours in an eight-hour workday and handle objects
weighing up to ten pounds, making it sedentary in its exertion
demands.  The ALJ determined, based on the medical opinion of her
treating physician, that Godwin was able to meet these exertion
demands and, therefore, she was able to perform her past work.
The ALJ did not need to inquire into whether there was any other
type of work that Godwin would be able to perform since he
determined that she was able to perform her past work.  20 C.F.R.
§ 404.1594(f)(8).

    The ALJ's determination that Godwin is no longer disabled
due to medical improvement of her impairment is supported by
substantial evidence in the record and does not contain legal
error.  The ALJ methodically considered the steps required to
conduct a continuing disability review, and supported each
conclusion with substantial evidence as discussed above.  For
example, at the Comparison Point, Dr. Nelson noted that Godwin
had a limited range of motion both in her neck and in her trunk,
paravertebral spasms, diminished sensation in her left foot, and
a paravertebral muscle sprain at both the cervical and the lumbo-

sacral areas of her back.  Dr. Nelson also noted that Godwin
exhibited a moderately diminished range of motion.  Also at the
Comparison Point, Dr. Radna indicated that Godwin could never
sit, stand or walk for more than fifteen minutes each in an
eight-hour work day and she could occasionally lift or carry up
to five pounds, but could never handle anything heavier than
that.  Nine months after her back surgery, however, Godwin's
condition had shown marked improvement.  When Dr. Bagner examined
Godwin on February 28, 2000, he noted that she demonstrated a
normal range of motion throughout her arms and she exhibited no
sensory abnormalities.  The only abnormal findings reported on
that date were a slightly diminished grip strength (4/5) in her
left hand and some complaints of pain on motion of her spine.

Moreover, in March 2000, the SSA reviewing physician
determined, based on all the medical evidence in Godwin's file,
that Godwin retained the ability to perform a full range of
sedentary work.  In April 2000, the Commissioner determined that,
while Godwin's medical impairment continued to be severe, it no
longer prevented her from performing her past relevant sedentary
level work[5] and she was therefore no longer disabled.  Dr.

---

[5]  The evidence of Godwin's depression during the illness
and subsequent death of her daughter is not inconsistent with the
finding that she was able to perform sedentary work.  Rather, Dr.
Bronsky reported that Godwin was able to understand and carry out
simple instructions, her attention and concentration were
adequate for such tasks, and she was able to make appropriate
decisions and learn new tasks.  While Dr. Bronsky indicated that
Godwin might have some difficulty with interpersonal interactions
and dealing with stress, there is no evidence that either of
these limitations would interfere with Godwin's performance of
her past sedentary work.

Jacoby, Godwin's treating physician, reported Godwin's physical exertion capacity to the SSA in an August 2000 questionnaire which was consistent with an ability to perform sedentary work. In the opinion of Dr. Lathan, the consulting physician who examined Godwin in September 2000, Godwin's only functional limitation was handling items weighing more than twenty pounds, an assessment which is consistent with an ability to perform a full range of light work.[6] Finally, in October 2000, the SSA reviewing physician determined, based on all the medical evidence in Godwin's file, that she could lift twenty-five pounds frequently and up to fifty pounds occasionally, and that she could sit, stand or walk for about six hours in an eight-hour day, which is consistent with an ability to perform medium work.[7] Although there is some limited evidence in the record that runs counter to this conclusion,[8] the evidence described above

---

[6] See 20 C.F.R. § 404.1567(b) (light work involves frequent handling of ten pounds and never handling more than twenty pounds).

[7] See 20 C.F.R. § 404.1567(c) (medium work involves frequent handling of up to twenty-five pounds and never more than fifty pounds).

[8] For example, from the initiation of her benefits in March 1995 until the hearing before the ALJ in February 2002, Godwin has attested to being in severe and constant pain. "An individual's statement as to pain or other symptoms," however, "shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A). Although Godwin may suffer from pain, substantial evidence from physicians supports the conclusion that this pain does not prevent Godwin from performing sedentary work.
For another example of contrary evidence, in September 2000, Godwin told the psychiatrist, Dr. Bronsky, that she was unable to do the cleaning, laundry, or shopping, and she walked with a limp. It should be noted, however, that on the same date, Godwin reported to Dr. Lathan that she was able to wash and dress

constitutes more than sufficient evidence that "a reasonable mind
might accept as adequate to support [the] conclusion" that Godwin
is no longer disabled.  Halloran, 362 F.3d at 31 (citation
omitted).

Godwin objects that the evidence from her treating
physicians is in direct conflict with the SSA's medical evidence.
Although Godwin does not explain to what conflict she is
referring, presumably her attention is focused on Dr. Jacoby's
statement that Godwin was unable to work because she was unable
to use her left hand.  While "a treating physician's report is
generally given more weight than other reports," in circumstances
where "other substantial evidence in the record conflicts with
the treating physician's opinion, . . . that opinion will not be
deemed controlling."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.
1999).  Indeed, "the less consistent that opinion is with the
record as a whole, the less weight it will be given."  Id.  In
addition, the "ultimate finding" of whether a claimant is
disabled and therefore unable to work is "reserved to the
Commissioner," id. (quoting 20 C.F.R. § 404.1527(e)(1)), which
means that the SSA "considers the data that physicians provide
but draws its own conclusions as to whether those data indicate
disability."  Id.  As a consequence, "[a] treating physician's
statement that the claimant is disabled cannot itself be
determinative."  Id.

_____

herself, cook, shop, clean, and do laundry.  Dr. Lathan also
noted on that occasion that Godwin's gait was normal and she
required no assistive device.

The detailed medical evidence in the record does not support Dr. Jacoby's conclusory statement in the May 2000 questionnaire that Godwin is "unable to work" because of an inability to use her left hand.  There is no indication in the record that Dr. Jacoby measured Godwin's grip strength, while the objective evidence provided by the SSA physicians indicates that she only had a slightly reduced grip strength in her left hand -- 4/5 on the left compared to 5/5 on the right -- in February 2000, and that by September 2000 she had full (5/5) grip strength bilaterally.  In any event, even if Godwin's capacity to use her left hand were impaired to some degree, there is substantial evidence that that impairment did not interfere with Godwin's ability to perform sedentary work, i.e., to sit for six hours with occasional standing and walking, as well as to occasionally lift objects such as ledgers or small tools that weigh no more than ten pounds.  See 20 C.F.R. § 404.1567(a).  The ALJ properly drew his own reasoned conclusions after considering the substantial evidence provided by Drs. Bagner and Lathan as well as Dr. Jacoby's data regarding Godwin's physical abilities -- data that indicates that under SSA regulations, Godwin is not disabled.

Godwin also argues that she was denied the right to cross-examine and refute the medical evidence of the SSA.  Claimants seeking disability benefits have a right to cross-examine the author of an adverse report and to present rebuttal evidence. Treadwell v. Schweiker, 698 F.2d 137, 143 (2d Cir. 1983).  If a

party wishes to cross-examine the author of an adverse report, the party may request the ALJ to issue a subpoena for the appearance and testimony of the author. Fernandez v. Schweicker, 650 F.2d 5, 8 (2d Cir. 1981). See also 20 C.F.R. § 404.950(d); Diaz v. Shalala, 59 F.3d 307, 316 (2d Cir. 1995). Requests must be in writing and should be filed at least five days prior to the hearing. 20 C.F.R. § 404.950(d)(2).

Godwin was notified of the opportunity to make such a request in the two "Notice of Hearing" letters that she received. There is no indication in the record that Godwin made such a request either prior to the hearing as instructed, or even during the hearing. Godwin was also notified of her right to obtain representation to assist her, both in the Notices of Hearing, and at the hearing itself, and Godwin expressed her desire to proceed without representation. Because Godwin had an adequate opportunity to subpoena witnesses for her hearing but did not do so, her right to cross-examine was not denied. See Rivera v. Chater, 95 Civ. 568 (DLC), 1996 WL 374155, at *13 (S.D.N.Y. July 2, 1996) (citing Diaz, 59 F.3d at 316).

Even if Godwin were to argue that her failure to subpoena adverse witnesses was due to her pro se status, she could not show that her right to subpoena and cross-examine witnesses was denied. "[I]n a disability benefits case involving a pro se claimant -- especially one handicapped by ill health, and inability to speak English well," such that she is "plainly unequal to the task of developing her own record," the right to

subpoena and cross-examine experts submitting reports adverse to a claimant's cause is "important, particularly when there is 'substantial reliance' on the report by the hearing examiner." Fernandez, 650 F.2d at 8 (citation omitted). Where there are "serious questions raised relating to the quality and trustworthiness" of an adverse expert report, the report's conclusions may be "sufficiently controversial to merit cross-examination." Id. Failure to investigate the reliability of a controversial report can be compounded by a lack of inquiry by the ALJ into the claimant's subjective symptoms at the hearing. Id. at 9.

There is no indication that Godwin was unequal to the task of developing a record on her own behalf; indeed, she demonstrated no language barriers or inability to comprehend the proceedings, and she brought documents to the hearing of her own accord to add to the record. Moreover, there are no questions raised relating to the quality and trustworthiness of any of the reports contained in the record. Even on this appeal, Godwin has not raised any such claims. Indeed, the report to which the ALJ assigned perhaps the most weight, Dr. Jacoby's report, is not even properly termed an "adverse report" to the extent that Dr. Jacoby concluded that Godwin was unable to work, and was used solely for the data provided in the report. The ALJ even attempted to gather additional assessment information from Dr. Jacoby without Godwin having made a request for such

information.[9]  The ALJ also properly and fully developed the record on Godwin's behalf.  The ALJ questioned Godwin in a detailed and probing manner, asking about the nature of her pain, including its frequency, intensity, and location, as well as the circumstances that trigger it, physical movements she can perform, activities in which she participates, and details about her visits to various doctors.  For all of these reasons, Godwin's right to cross-examine witnesses was not denied.

## CONCLUSION

The Commissioner's motion for a judgment on the pleadings is granted.  The Clerk of Court shall close the case.

SO ORDERED:

Dated:     New York, New York
           July 18, 2005

                                   _____
                                        DENISE COTE
                              United States District Judge

---

[9]  Any obligation the ALJ may have had to obtain such additional information is limited by regulation as follows: "We may not seek additional evidence or a medical source when we know from past experience that the source either cannot or will not provide the necessary findings."   20 C.F.R. § 404.1512(e)(2). Accordingly, the ALJ, having made three attempts to secure additional information from Dr. Jacoby, was not obligated to pursue this inquiry further.